Good morning, everyone. You may be seated. Now, where are the students from? I want to welcome the students. I can't hear. From Mission High School. From Mission High School. Welcome. It's nice to have you here. And I also want to thank Judge Richard Lynn for joining us again from the Federal Circuit in Washington, D.C. My pleasure. Thank you very much. We will take the cases up in the order in which they appear on the docket. And the first case is Wilk v. Neven. You may proceed, counsel. Thank you, Your Honor. May it please the court. My name is Matthew Knoller, court appointed pro bono counsel for Appellant Robert Wilk. I will watch my own time and try to reserve two minutes for rebuttal. All right. Thank you. It is undisputed that at least one of the defendants in this case, after learning that Mr. Wilk had been threatened by his fellow inmate, Mr. Nunley, chose to house Mr. Wilk and Mr. Nunley in the same residential quad, despite knowing that doing so would create opportunities for the two men to interact that would not have existed under alternative available housing arrangements. There's evidence in the record from which a jury could conclude that the risk of a confrontation created by that housing decision and the risk that any confrontation would involve violence against Mr. Wilk was too high to be reasonable. By taking that decision away from the jury on summary judgment, the district court erred. And in explaining why, I would like to start with the reasonableness of the housing decision and then turn to the question of which defendants can be held responsible for that decision. This court has held in the LaMire case, among others, that whether a prison official's response to a threat is reasonable is a question of fact that generally should not be resolved on summary judgment. The district court here held that the housing decision was reasonable as a matter of law, because first, Mr. Wilk and Mr. Nunley were housed in different units within the same quad. And two, because those units usually were on different schedules. But this court's cases show that those two factors do not automatically make the housing decision reasonable. And there are other facts in the record from which a jury could conclude that it wasn't. There was also a determination, I believe, that the only opportunity for these two prisoners to interact was in the courtyard where there were guards posted. So, Your Honor, I don't think there was a conclusion that that was the only opportunity for interaction. That certainly was an opportunity for interaction. And if I could respond to the last thing you said about guards being posted, there's actually no evidence of that. The only statement to that effect in the record is a request for admission that the defendant served on Mr. Wilk that Mr. Wilk didn't admit. Thank you. Can I clarify the record on something, too? Was Mr. Wilk told or otherwise informed that that Nash, no, no, not Nash, the Nunley, I guess, that Nunley was in administrative segregation? And if he was, was he later informed that he was being moved back to Unit 8? So there is evidence Mr. Nunley alleged in his verified complaint that he was told at the October 2013 FCC meeting that Mr. Nunley would be moved to administrative segregation. Then at the subsequent meeting in November 2013, he alleges that he was told that Mr. Nunley was still in administrative segregation. As far as the record supports, and Mr. Wilk has alleged, he was never informed that Mr. Nunley had in fact been placed in the Unit 7A quad with Mr. Wilk until he was attacked in the yard. And so based on that evidence in particular, I think a jury could conclude not only that Mr. Wilk wasn't safe with Mr. Nunley in the same quad as him, but that the defendants knew that and affirmatively misled Mr. Wilk in order to get him to agree to go back to the quad. Now, if Mr. Wilk had been informed that Nunley was in the other living unit that shared the common quad rather than in Ad Seg, does Mr. Wilk allege that he would have sought to be housed somewhere else? He does, Your Honor. He alleged in his verified complaint and also in response to requests for admission and in his verified summary judgment opposition, that had he been told that Mr. Nunley would be in the Unit 7A quad with him, he would not have agreed to go back. Now, I suppose it's possible that the prison could have forced him to anyway, but during the October 2013 meeting, he requested to be separated from Mr. Nunley and has alleged that he would not have agreed to go back had he known that Mr. Nunley was still going to be there. Does he have a right to object to which unit he's placed in as a prisoner? I don't think the record is entirely clear on that process, Your Honor. My understanding is that as part of the FCC process, they hear from the inmate who is complaining about the threat. So I certainly think he would have had the opportunity to make his views known. And in response to his request for admission, the defendants have admitted that he asked to be separated from Mr. Nunley. So does that go to whether the three defendants were aware of the substantial risk that Mr. Wilk would be under if they just put him back? I think it does. It certainly goes to Mr. Levitt's knowledge because everybody agrees that he was at the 2013 FCC meetings. And so I think a jury could conclude that based on what Mr. Wilk told them at those meetings, and based on the evidence that the officials affirmatively misled him about Mr. Nunley's location, they would have known that there was a substantial threat by placing them both in the same quad. As to the other two defendants, Mr. Nevin and Ms. Nash, there is a dispute about whether those two defendants were present at the October 2013 meeting or otherwise learned about the threat. My briefs, I think, go through the genuine disputes of fact as to those issues that should have precluded summary judgment. In my two minutes before I sit down, I'd like to emphasize, though, that even if you disagree about the state of the record as to those two defendants, I think summary judgment was still improper because it was premature under Rule 56D. At the time that the defendants moved for summary judgment, Mr. Wilk had filed two motions to compel, including one that was pending at the time of the summary judgment motion, as well as a motion for a status conference to discuss, among other things, the difficulties Mr. Wilk had had during discovery. And one of the areas of information that he had sought in his motions to compel was evidence related to the October 2013 FCC meeting. And in defendant's summary judgment motion, they submitted, for the very first time in the case, a declaration from Mr. Levitt that they interpret now as identifying the attendees of that meeting. But at the time they submitted that declaration, discovery had been closed for a month, and Mr. Wilk's opportunity to move to amend his complaint had been expired for two months. So at that point, under this court's cases, which I've cited in my briefs, the district court should have construed Mr. Wilk's discovery filings as requests under Rule 56D to defer summary judgment to get additional discovery. At that point, the district court can only deny those requests if the discovery sought would be fruitless. I know in your papers here you've asked that we direct the district court to appoint pro bono counsel in the district court in the event that we remand. Mr. Wilk's no longer incarcerated. What authority do we have to direct the district court to do that if we should agree with you as to the desirability of counsel? Yes, Your Honor. So I don't think Mr. Wilk's incarcerated status has any effect on this court's authority. This court always has the discretion to appoint counsel for a pro se plaintiff. And admittedly, the fact that he's no longer incarcerated maybe removes one factor leaning in favor of that appointment. But I think there are still others that would support that appointment. His difficulty in discovery, the now clear need to investigate multiple additional prison officials as to what they knew when, are all things that, particularly probably through depositions, that an attorney is really going to be able to assess effectively. If there are no further questions, I would reserve the balance. All right, thank you, counsel. Good morning, Your Honors. Morning. This is Frank Todry, Senior Deputy Attorney General for the state of Nevada, representing the respondents, defendants, Nevin, Nash, and caseworker Levitt. May it please the court. First of all, thank you for your counsel for coming on pro bono while it makes your job a little bit more difficult. It really raises the discourse of litigation in this arena and helps get real case law that guides us in something that can be vague sometimes. Thank you for addressing that. Well, the fundamental question here, Your Honors, is whether the individual actions taken by the respondents upon learning of a threat against Wilk's person were reasonable, and I would contend that they were. The caseworker Levitt, it cannot be disputed that he did not ignore or disregard the risk upon learning it. That's the baseline standard under Farmer v. Brennan. Well, how can you say that it can't be disputed? We do know, at least for purposes of the cases we now have it, that he indicated that he was in danger. We also know, from what Mr. Wilk says, that Nunley was never put on the enemies list, even though it appears that that would have been a proper procedure. So how can you say that Levitt acted properly? Yes. So the very day that Levitt learned of the threat, he moved both of the inmates into administrative segregation, which is a higher security, yet more restrained level of classification, while the investigation was pending. Twice within two weeks, there was full classification committee meetings conducted to determine where a safe housing would be. Simultaneously, disciplinary actions were taken against Mr. Nunley. During each of the case notes and the CMS sheet, caseworker Levitt did indeed write that the reason for the administrative segregation was due to Wilk. Well, you're taking a long time, and you're not yet addressing the point I made. Apparently, there is an enemies list that the prison does maintain, and that Mr. Nunley was never put on that list. Is that correct? Yes. Yes. That's my problem. Okay. Well, to address that, the force and effect remains the same. The housing decisions had the specific notes that this separation occurred because of Nunley making the threats against Wilk. That information was very present for anybody that made any housing decisions, and no— I'm not sure that helps your client, meaning if they knew, and they did it anyway, that's a different kind of a problem, but that remains a problem. Well, generally, there's a—beyond the two classifications done, there's six-month reviews—mandatory reviews—for someone in protective segregation. Sorry. I lost my train of thought for a second. So when that housing decision was made, we were able to put them in protective seg, and something that maybe wasn't discussed too much in the underlying briefing is before this occurred, both inmates were already in protective segregation. So the housing options were quite a bit more limited than somebody that can go into general population. So other than—well, the first option was to attempt to transfer Mr. Wilk to a different yard, Lovelock, that's a smaller institution that generally has protective custody. A different yard or a different prison? Different prison. Yeah. Are there—I know that we've got seven and eight. Are there other units within the prison that are comparable in terms of security to seven and eight? At that point in time, no. How do we know that? That one's not on the record, the amount of protective—nowadays, it's actually six. Back then, there was two protective segregation units out of 12. So, Counsel, I think one of the problems is we don't—there's a lot of answers to on this record, and that's probably because, I guess, Wilk was proceeding pro se and was not able to effectively get his discovery, which I think, you know, had we gotten that discovery, we might have some answers to some of these questions. And that does raise a lot of issues that would undermine granting summary judgment in this case. Well, the—I will address the primary document that appears to be a contention, which is the declaration of Carrie Leavitt, which identifies who is at the full classification committee. Right. This—these type of case notes, so these are within Mr. Wilk's own file. He would have had the opportunity to review his own inmate file, whether he had a litigation or not. He would not have been able to keep it in his housing unit, but he doesn't—he doesn't need discovery, litigation to be able to identify these documents. He can always look at his grievances. He can always look at his case notes. So I would submit that it's unavailing to say he couldn't receive those documents. But, like, for example, Mr. Leavitt declares that he does not know why central monitoring systems records were not updated. Perhaps discovery could tell us why. Maybe Mr. Leavitt never even sent the request to the warden. Or if he did send it to the warden, then maybe that would establish that the warden, Nash, acted with deliberate indifference, having received it and not putting it into the central monitoring system. And to that end, discovery, he likely could have asked that question. However, it is unclear whether that could have been responded to in DOC. Nevada Department of Corrections is still under a paper system for that sort of item, so it's unclear if that would be definitive. But to that extent, I don't want to call it a harmless error, but having him on the enemy list would not necessarily have precluded anything from occurring. Mr. — But would it have precluded them being housed in the same unit? Not necessarily, because they're not actually in — while it's in the same quad, they're within two separate protective segregation units of High Desert State Prison. With Nunley, they're likely going to run into the same finite resources of not being able to house protective segregation inmates everywhere. So the option would have been for one of them to go up to Lovelock, but being that it was full, neither could. So in lieu of keeping him in administrative segregation ad infinitum, he could only go to another protective segregation yard where they're going to be on different schedules, have higher guard posts, and not have any kind of programming together. Although if the only alternative — and I say this as an if — if the only alternative is to have them in the separate units but with the common yard, it might have helped had the guards known that there was difficulty between the two. For example, had they known that Nunley was on the enemy's list. The guards didn't know that. So when Mr. Wilk is out in the yard waiting to go to class and Mr. Nunley attacks him, the guards have no idea that this was a possibility because he wasn't on the enemy's list. Correct. So even if it's so, and I say if, that the only alternatives were — the only alternative realistically available was to put them in the units that shared the common yard, putting them on the enemy's list would have helped a lot. Well, let me address that in when those enemy lists are generally looked at. The officers that are generally looking at enemy lists, housing information, are caseworkers that are not on the yard when housing decisions are made, when parole decisions are made, classification decisions are made. There's not any kind of, for lack of a better term, real-time access, real-time knowledge that a correctional officer that is escorting a unit would have as to the individual skirmishes between the inmates. But shouldn't there be when, like, the allegation — I mean, taking the facts in the light, most favorable to Mr. Nunley as we have to — Nunley says that Wilk threatened him with injury and death while they were housed in Unit 7. And, I mean, shouldn't the guards on duty have been apprised of that? The — any guards that were present would have been called on as witnesses. Generally, the day-to-day guards are not apprised of the internal disciplinary actions, so unless they were necessarily there that day, involved with the There's not, like, a distribution sheet every day of what occurs between inmates. I mean, there's skirmishes almost every day, just a misunderstanding. Is that one of the functions of this enemy list? No, the enemy list is solely going to be in his own internal records. Unless there's a highly — unless there's kind of a larger-scale situation — a gang, strategic threat groups — The enemies list does not apprise — one of the purposes of the list is not to apprise the other guards of an incident or a concern? It is to apprise anyone that is reviewing their inmate information. That's mainly going to be on the case management side. The correctional officer — I mean, yes, the correctional officer is generally on the yard, while privy are not going to be undertaking daily reviews of the individual inmates, just as a numbers issue. I would have thought, though, that had Mr. Nunley been put on the enemies list, enemy of Mr. Welk, that it would have been a very good idea, and perhaps deliberate indifference for not doing it, if they really are going to be in these two units that share the common yard, not to alert the guards of the danger that's present. Well, Nunley was — Well, you're saying they're not alerted, but it seems to me they should have been. They're not, at real time, having all knowledge of every individual enemy list. But at the time, I would maintain it still would not have had any effect or function on stopping this. Oh, that can't be right. Nunley was — That is to say, if the guards know that Nunley is on Welk's enemies list, and Welk is out on the yard waiting to go to class, the guards could easily, then, have said — arranged it so that Nunley doesn't have access to the yard. Of course they could have done that. No, they didn't. And the reason they did it, or at least a reason, was they didn't know. Well, he was going — the situation wasn't a normal scheduled guard function — moving function. Nunley was going to — he was going to medical. And inmates in protective segregation are always accompanied wherever they go because they're going to be going past general population. While escorted on an unscheduled medical visit, that is when he broke loose. Yeah, I understand. I know. I get that. Now, I've got one more question. We're running over time, so I don't want to spend too much time on it. I noticed in your brief, on two occasions, your brief says that Nunley does not have a history of excessive violence or much violence. And then two other occasions it says no violence. How do we know that? Do we know anything about Nunley's history except the fact that Wilk wanted to put him on the enemy's list? Other than his protective segregation status, there is no reason. So what you say in the brief is without foundation in the record? No. One of the declarations had noted — I believe it was Nevin — noted that he did not have a violent history. So the actual disciplinary file is not on it, but it's through declaration that he does not have a violent history. So it may be relevant in discovery to figure out, actually, what kind of a history Nunley had. I mean, it could — Yes, Your Honor. And this is hypothetical. But if it turns out Nunley is well known to the prison officials to be crazy violent, that would change the complexion of the case. Now, I don't say that that's true, but it might be. Yes, Your Honor. And it does. And then it would be kind of comparing the apples to apples of the state of Florida class cases and the plethora. All right. Thank you very much, counsel. Thank you for your time. Apologies for running over. No, you did so in response to questions by the court. It's perfectly fine. I appreciate your time. Thank you. Thank you. Thank you, Your Honor. Just a few quick points on rebuttal. I think we heard a lot of things in respondents' argument about the structure of the prison and their policies and the way that the enemy list works that simply aren't in the record. I have no reason to dispute any of Mr. Todry's representations, but there's just no evidence of those claims. That's something that can be explored through further discovery on remand. In particular, one of the things Mr. Todry mentioned about guards not having real-time knowledge of inmates' enemy status, if that's true, then the only individuals in this case who knew that Mr. Wilk had been threatened were the defendants. And nevertheless, they housed Mr. Wilk in a housing situation where they knew that he could be exposed to Mr. Nunley in the yard and apparently knew that none of those guards had any way to know that Mr. Nunley shouldn't be allowed into the yard at the same time. And to further explore the effect of the enemy list, which officials would have known about the enemy list, what they did with Mr. Wilk's request to identify Mr. Nunley as his enemy, we just need more discovery, in particular, into the new officials who were named in Mr. Levitt's declaration. As to Mr. Nunley's disciplinary record, I haven't seen that in the declarations. Maybe I missed it. It's certainly possible. But even if it's there, it's really not that relevant because there's no dispute that at least one of the defendants was informed by Mr. Wilk that Mr. Nunley had threatened to kill him. They knew Mr. Nunley was a threat. They still chose to house Mr. Wilk and Mr. Nunley under circumstances that a jury could find was unreasonable. Thank you, Your Honor, and thank you for the opportunity to argue this case before you. Thank you, counsel. I want to thank both counsel for their arguments today and thank Mr. Knoller and his law firm, King & Spalding, for their appearance pro bono. Thank you. Thank you, Your Honor. Wilk v. Nevin will be submitted. We have previously submitted Sikulski v. Meeks, and we will take up United States v. Ryan.
judges: Wardlaw, W. Fletcher, Linn